UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TINA MANISCALCO,                    *
                                    *
            Plaintiff,              *
        v.                          *
                                    *          1:14-cv-14672-ADB
CAROLYN W. COLVIN,                  *
ACTING COMMISSIONER OF              *
SOCIAL SECURITY,                    *
                                    *
            Defendant.              *

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Plaintiff Tina Maniscalco ("Ms. Maniscalco") brings this action pursuant to Section

205(g) of the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), challenging the final decision

of the Commissioner of Social Security (the "Commissioner") denying her claim for Social

Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI")

benefits. Before the Court is Plaintiff's Motion for an Order Reversing the Commissioner's

Decision [Dkt. 16], and Defendant's Motion for an Order Affirming the Commissioner's

Decision [Dkt. 21]. Ms. Maniscalco argues that the Administrative Law Judge ("ALJ"), in

reaching his decision that Ms. Maniscalco was not disabled, erred by: (1) failing to properly

assess the impact of her mental impairments, and (2) relying on unreliable testimony from a

vocational expert ("VE").

As described below, the Court concludes that the ALJ's decision was not supported by

substantial evidence. Therefore, this Court <u>ALLOWS</u> Plaintiff's Motion [Dkt. 16] and <u>DENIES</u>

Defendant's Motion [Dkt. 21].

## I.   BACKGROUND

### A.  Procedural Posture

On March 24, 2009, Ms. Maniscalco filed applications for SSI and SSDI. [AR 291-304].[1]

Both applications were denied at the initial level of review on July 20, 2009 [AR145-51] and

upon reconsideration on December 31, 2009. [AR 160-165].

On September 22, 2011, an administrative hearing was held before an ALJ, at which Ms.

Maniscalco was represented by counsel and testified. [AR 86-117]. On October 12, 2011, the

ALJ issued a decision denying Ms. Maniscalco SSDI and SSI benefits. [AR 122-39].

Subsequently, Ms. Maniscalco appealed to the Appeals Council [AR 246-52], which remanded

the case for another hearing that was held on April 23, 2013 [AR 256-77]. On September 27,

2013, the ALJ issued a second decision, again denying Ms. Maniscalco SSDI and SSI benefits.

[AR 15-37]. On November 5, 2014, the Appeals Council denied Ms. Maniscalco's request for

review, thereby making the ALJ's September 27, 2013 decision the final decision of the

Commissioner. [AR 1-6].

On December 19, 2014, Ms. Maniscalco filed her complaint in this Court, seeking review

of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). [Dkt. 1].

### B.  Facts

#### 1. Age, Education and Work Experience

Ms. Maniscalco was born in 1961 and was 47 years old at the time she applied for SSI

and SSDI benefits. [AR 43]. She testified that she left school in the eighth grade. As a teenager,

---

[1] References to pages in the Administrative Record are cited as "AR __." The ALJ's decision can be found beginning at AR 15. The administrative hearing transcript can be found beginning at AR 38.

she attempted to attend night school to obtain a high school equivalency diploma, but she did not

complete the program. [AR 44-45]. She last worked on February 21, 2009 at a Boston restaurant,

where she performed part-time work cleaning tables and bringing stock inside. [AR 47, 331-44].

### 2. Medical Evidence

The medical record shows that Ms. Maniscalco has been involved in a number of motor

vehicle accidents, including incidents in December 2008, May 2009, and April 2010. [AR 97,

525, 1222-258]. Following these accidents, Ms. Maniscalco began to undergo treatment for

various physical impairments, as well as depression and anxiety disorders.[2] On June 1, 2009,

during a consultative psychological examination with Licensed Clinical Psychologist Seth A.

Doolin, Ms. Maniscalco reported "that she has become increasingly isolative . . . finds herself

increasingly nervous around others, finds herself sleeping more, and feels more sad and agitated

as of late." [AR 541]. The psychologist observed that Ms. Maniscalco was appropriately dressed

and well groomed, her eye contact was appropriate, and her speech was normal and relevant to

the topics being discussed. [AR 542]. He also noted that "she appeared to have a somewhat

defensive or argumentative air about her in her tone" and that she became "noticeably distraught

when she had difficulty recalling items in short term memory and began to tear up." Id. Ms.

Maniscalco denied suicidality as well as the intent to harm another. Id. She scored 25/30 on a

Mini Mental Status Exam, the very lowest end of the acceptable range for someone of her age

and education. [AR 543]. Specifically, she was unable to recall any of the items in short term

memory. Id. At that time, Doolin diagnosed Ms. Maniscalco with depressive disorder and

---

[2] In this action, Ms. Maniscalco does not directly challenge the ALJ's findings or decision with
respect to the effects of her physical impairments. Therefore, this Memorandum and Order will
focus on Ms. Maniscalco's alleged mental impairments, and facts relating to her physical
limitations are discussed only when necessary.

assigned her a global assessment of functioning ("GAF") score of 60. [AR 544].

On July 23, 2010, Ms. Maniscalco saw Clinical Nurse Specialist ("CNS") Addie Dublin. [AR 915]. CNS Dublin assessed Ms. Maniscalco as an alert, cooperative, slightly guarded woman with a mildly anxious, irritable, and sad affect, a concrete thought process, and limited insight. [AR 917]. CNS Dublin found no evidence of psychotic thought or thoughts of self-harm. Id. At that time, CNS Dublin diagnosed Ms. Maniscalco with a depressive disorder not otherwise specified and anxiety not otherwise specified, with a GAF score of 55. Id. Ms. Maniscalco returned to visit CNS Dublin five more times in 2010, as well as five more times in 2011. [AR 915-933, 977-989, 1001-1003, 1009-1010, 1014-1018, 1022-1027, 1031-1033]. On April 14, 2011, CNS Dublin noted that although Ms. Maniscalco had been diagnosed with depression and dysthymic disorder, Ms. Maniscalco's dysthmic disorder was "fairly well-controlled with [her] current med[ical] regimen." [AR 1032]. At that time, CNS Dublin stopped treating Ms. Maniscalco, who had established a mental health care relationship with another therapist. Id.

On February 17, 2011, Ms. Maniscalco saw Licensed Clinical Social Worker ("LCSW") Ann Maksymowicz. [AR 1039]. LCSW Maksymowicz noted that Ms. Maniscalco was well groomed; her behavior, thought, and speech were within normal limits; and her judgment and impulse control were good. Id. At that time, she diagnosed Ms. Maniscalco with major depressive disorder. Id. LCSW Maksymowicz treated Ms. Maniscalco through June 2012. Records from these visits indicate that Ms. Maniscalco had a depressed mood and affect. [AR 1037-1046, 1072-1081].

On November 30, 2011, Ms. Maniscalco saw Dr. Nathan Sidley, a psychiatrist. [AR 1082-1084]. He noted that Ms. Maniscalco was a cooperative woman, whose comments were well-organized and relevant to the ongoing conversation. Id. He also noted that her affect was

depressed, that she "spoke relatively softly and somewhat slower than usual" and that "she did not cry, though she seemed on the verge of it at times during the interview." [AR 1084]. Dr. Sidley diagnosed her with chronic depression. Id. Ms. Maniscalco returned to Dr. Sidley three more times, during which her mental status evaluation remained largely the same. [AR 1086-1089].

In June 2012, Ms. Maniscalco saw Registered Nurse ("RN") Nell Peiken. [AR 1090]. RN Peiken noted that Ms. Maniscalco felt that her medications were working and that "her depression, while still present two-three days/week is better than it was before she began taking psych meds back in the fall of 2011." Id. On July 26, 2012, her mental status evaluation remained the same. [AR 1092]. On January 14, 2013, RN Peiken completed a psychiatric evaluation of Ms. Maniscalco and noted that her general appearance was "guarded, angry, well dressed" and her weight was within normal limits. [AR 1127]. She also noted that Ms. Maniscalco had "a lengthy pause after a question is asked of her during which she silently stares straight ahead of her for several seconds before answering." [AR 1128]. Furthermore, RN Peiken found that Ms. Maniscalco's mood and affect were irritable but that her language, concentration, orientation, judgment and insight, and thought process were within normal limits. Id. At that time, RN Peiken diagnosed Ms. Maniscalco with major depressive disorder, generalized anxiety disorder, and insomnia. Id. RN Peiken also noted problems with Ms. Maniscalco's short term memory and referred her to Dr. Mia Minen for a memory evaluation. Id.

On March 13, 2013, during a neurological examination with Dr. Minen, Ms. Maniscalco scored a 20/30 on a MOCA test, and Dr. Minen noted that "her cognitive testing shows poor performance in multiple domains but it is not clearly in the pattern of a neurodegenerative process. Her depression and anxiety, difficulty with sleep, medication and pain could all be

contributing factors to her poor performance on the testing." [AR 1219-1221].

### 3. Opinion Evidence

On July 14, 2009, Robert Lasky, Ph.D., a state agency non-examining source, rendered an opinion regarding Ms. Maniscalco's psychiatric condition. [AR 546-559]. He cited medical evidence from December 2008 to March 2009. [AR 546]. Dr. Lasky opined that Ms. Maniscalco's major depressive disorder did not cause any severe impairment. Id. He found that Ms. Maniscalco's condition imposed mild functional limitations including restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. [AR 556].

On December 30, 2009, Dr. Michael Daniels, MD, another state agency non-examining source, also rendered an opinion regarding Ms. Maniscalco's psychiatric condition. [AR 597-610]. He cited medical evidence from December 2008 to March 2009. [AR 597]. Dr. Daniels found that Ms. Maniscalco's depression did not cause any severe impairment in her ability to do basic mental work activities. Id. He opined that Ms. Maniscalco's condition imposed mild functional limitations including restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. [AR 607].

On January 6, 2011, treating source CNS Dublin rendered an opinion regarding the effects of Ms. Maniscalco's mental impairments on her ability to do work-related activities. [AR 932-933]. CNS Dublin opined that Ms. Maniscalco's symptoms preclude her from or markedly limit her ability to understand and remember very short and simple instructions, to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration sufficient to perform work tasks throughout an eight-hour work day, to work in coordination with or proximity to others without being distracted by them, to complete a normal

work day and workweek without interruptions from psychologically based symptoms, to perform

at a consistent pace without an unreasonable number and length of rest periods, and to interact

appropriately with the general public. Id.

On August 23, 2011, treating source LCSW Maksymowicz also prepared an opinion

regarding the effects of Ms. Maniscalco's mental impairments on her ability to do work-related

activities. [AR 1047-1048]. LCSW Maksymowicz found numerous functional restrictions on Ms.

Maniscalco's ability to understand and remember detailed instructions, to carry out detailed

instructions, to maintain attention and concentration sufficient to perform work tasks throughout

an eight hour work day, to complete a normal work day and workweek without interruption from

psychologically based symptoms, to perform at a consistent pace without an unreasonable

number and length of rest periods, to interact appropriately with the general public, and to set

realistic goals or make plans independently of others. Id.

### 4. Vocational Expert Testimony

At the April 23, 2013 hearing before the ALJ, Crystal Hodgkins testified as a vocational

expert ("VE"). [AR 70]. The ALJ asked the VE to assume a hypothetical person of the same age,

education, language, and work background as Ms. Maniscalco with the following physical

limitations:

> [she] would be able to lift and carry twenty pounds occasionally and ten pounds
> infrequently; would be able to sit for six hours out of an eight-hour work day; stand
> and/or walk for . . . six hours out of an eight-hour work day; would be able to climb
> stairs, ramps, ropes, ladders, and scaffolds on an occasional basis; occasionally be
> able to balance, stoop, crouch, kneel, and crawl; and would only occasionally be
> able to reach overhead bilaterally.

[AR 72]. The ALJ also stated that a hypothetical person would have the following mental

limitations:

> [she] would be able to understand and carry out two to three-step tasks and would
> be able to maintain concentration, persistence, and pace for two-hour increments

over than [sic] eight-hour work day over a forty-hour workweek in performance of those two to three-step tasks; would be able to have superficial interaction with supervisors and coworkers; would be unable to perform tandem work with coworkers . . . would also be unable to have any direct contact with the broad general public . . . would be able to deal with minor changes in the work place.

[AR 72-73]. The VE concluded that such a hypothetical person could do the work of a laundry worker, inspector and hand packer, and fill and seal machine operator. [AR 73-74, 77].

## II.   ANALYSIS

### A.  Standard of Review

The Social Security Act, the statute under which Ms. Maniscalco seeks judicial review of the Commissioner's denial of her application for benefits, provides that:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405 (emphasis added). Thus, the Commissioner's findings are conclusive so long as they are supported by substantial evidence. See Nguyen v. Chater, 172 F.3d 31, 35 (1st. Cir. 1999).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The First Circuit has explained that:

the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts. We must uphold the [Commissioner's] findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). The Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte, 654 F.2d at 128).

In sum, "the court's function is a narrow one limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements." Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam)); Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)).

**B.  Social Security Disability Standard**

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); <u>see also</u> 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). The inability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511; <u>see also</u> <u>Ross v. Astrue</u>, No. CIV.A. 09-11392-DJC, 2011 WL 2110217, at *2 (D. Mass. May 26, 2011).

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

<u>Seavey</u>, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

The applicant bears the burden of showing that she is disabled within the meaning of the act for the first four steps. <u>Sherwin v. Sec'y of Health and Human Servs.</u>, 685 F.2d 1, 2 (1st Cir. 1982). Once the applicant has established that she is unable perform any of her past relevant work, the burden shifts to the Commissioner to prove the fifth step, which is that the applicant is able to engage in a substantial gainful activity which exists in significant numbers in the national economy. <u>Id.</u>

## C.  The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law: (1) Ms. Maniscalco meets the insured status requirements of the Act; (2) Ms. Maniscalco has not engaged in

substantial gainful activity since December 5, 2008;[3] (3) Ms. Maniscalco suffers from the following severe impairments: degenerative spinal changes, mild ankle arthritis, headaches, and depressive and anxiety disorders; (4) Ms. Maniscalco does not have an impairment, or combination of impairments, that meets or equals the severity of one of the listed impairments in 20 CFR Part 494, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926); (5) Ms. Maniscalco has the Residual Functional Capacity ("RFC") to perform "light" work with the following limitations: no more than occasional overhead reaching bilaterally; no more than occasional postural maneuvers balancing, stooping, kneeling, crouching, crawling, and climbing; she can understand and carry out two to three step tasks; can maintain concentration, persistence, and pace for two-hour periods; she must avoid tandem work with coworkers and direct interaction with the general public; she can at least superficially interact with supervisors and coworkers; and she can deal with minor workplace changes; (6) Ms. Maniscalco is not capable of performing her past relevant work; and (7) considering Ms. Maniscalco's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Maniscalco can perform. [AR 21-28]. The ALJ determined that Ms. Maniscalco was not disabled under the Act at the fifth step of the disability analysis. [AR 29].

The ALJ partially based his determination of Ms. Maniscalco's RFC on his finding that Ms. Maniscalco's testimony regarding her impairments' severity and their impact on her ability to work was not fully credible:

---

[3] Ms. Maniscalco reported working until February 21, 2009 as a waitress. [AR 334]. However, the ALJ concluded that Ms. Maniscalco has not engaged in substantial gainful activity since December 5, 2008 because her earnings records show only $1,400 total earnings in 2009. [AR 311]. Thus, the ALJ concluded that Ms. Maniscalco's work did not constitute substantial gainful activity. [AR 21].

> After careful consideration of the evidence, the undersigned finds that [Ms. Maniscalco's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Ms. Maniscalco's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible . . . .

[AR 24]. He also noted that the treatment notes of several of Ms. Maniscalco's therapists reflected only limited abnormal objective findings, evidenced by a GAF score of 55-60. [AR 26, 544, 917]. Additionally, the ALJ found that Ms. Maniscalco's mental impairments impose no more than mild restrictions on her daily living activities. [AR 26].

The ALJ also considered, but ultimately gave "little weight" to four pieces of opinion evidence relating to Ms. Maniscalco's mental impairments. Under the authority of the Social Security Act, medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgment about the nature and severity of an individual's impairments, including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment, and physical and mental restrictions." 20 C.F.R. § 404.1527(a)(2). The factors ALJs use in weighing medical opinions from treating sources, non-treating sources, and non-examining sources include the treatment relationship between the individual and a treating source; the degree to which the acceptable medical source presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings; how consistent the medical opinion is with the record as a whole; whether the opinion is from an acceptable medical source who is a specialist; and any other factors brought to the Commissioner's attention, which tend to support or contradict the opinion. See 20 C.F.R. § 404.1527(c).

The ALJ discounted treating source CNS Dublin's opinion that Ms. Maniscalco has marked limitations with respect to her ability to understand, remember, and carry out simple instructions, to sustain attention and concentration, to work in proximity to others, to complete a

normal work day without psychological interruptions, and to interact with the public. [AR 27]. The ALJ discounted CNS Dublin's opinion because (1) she is not a doctor or acceptable medical source for Social Security purposes; (2) the ALJ found that her opinion was inconsistent with CNS Dublin's treatment records; and (3) the ALJ further found that her opinion was not supported by the longitudinal objective medical evidence. Id.

The ALJ also gave "little weight" to treating source LCSW Maksymowicz's opinion that Ms. Maniscalco has marked limitations in her ability to maintain attention or complete a normal workday without psychological interruption. The ALJ rejected this opinion because (1) LCSW Maksymowicz is not a doctor or acceptable medical source for Social Security purposes, and (2) such marked limitations are not supported by LCSW Maksymowicz's own treatment records or the longitudinal medical evidence. [AR 27-28].

Lastly, the ALJ also gave "little weight" to the state agency medical consultants, Robert Lasky, Ph.D., and Michael Daniels, MD, who opined that Ms. Maniscalco has no severe mental impairments with no more than mild limitation in any mental functional area because they did not review the entire medical record and because the longitudinal medical evidence shows that Ms. Maniscalco suffers from mental symptoms, such as varying moods and some decreased memory. [AR 21, 546-559, 597-610].

Although he rejected each of the medical opinions in the record, the ALJ nonetheless concluded that the longitudinal medical evidence supported a finding that Ms. Maniscalco's symptoms would at least more than minimally affect her mental abilities do basic work activities. [AR 21].

After making his findings regarding Ms. Maniscalco's residual functional capacity at step three of the disability analysis, the ALJ went on to determine that Ms. Maniscalco was not

disabled at the fifth step of the disability analysis. [AR 29]. Specifically, the ALJ "asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." Id. The vocational expert testified that a hypothetical person with Ms. Maniscalco's limitations would be able to work as a laundry worker, inspector and hand packager, or fill and seal machine operator. Id. Based on the testimony of the vocational expert, the ALJ concluded that, considering Ms. Maniscalco's age, education, work experience, and RFC, Ms. Maniscalco is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate . . . ." Id.

### D.  Ms. Maniscalco's Motion to Reverse the Commissioner's Decision

Ms. Maniscalco challenges the ALJ's conclusion that she is not disabled on two primary grounds. First, she argues that the ALJ impermissibly made findings regarding Ms. Maniscalco's mental RFC without the support of any acceptable medical opinion. Second, Ms. Maniscalco argues that the ALJ's finding that there are jobs existing in significant numbers in the national economy that Ms. Maniscalco can still perform is not supported by substantial evidence, to the extent that this finding relies on unreliable testimony from the vocational expert. Id.[4]

---

[4] Although Ms. Maniscalco briefed a third argument – namely, that the ALJ erred in adopting the vocational expert's opinion that Ms. Maniscalco was capable of employment as a "laundry worker" – the Court finds this argument to be without merit. Ms. Maniscalco argues that the laundry worker position, which she claims requires *frequent* stooping and kneeling, is inconsistent with the ALJ's RFC findings that she could only *occasionally* perform postural maneuvers such as stooping and kneeling. [Dkt. 16, p. 11; AR 23]. After reviewing the Dictionary of Occupational Titles, however, the Court concludes that Ms. Maniscalco is mistaken. The position of laundry worker, DOT Code No. 302.685-010, 1991 WL 672657, requires only occasional stooping, and does not require kneeling. Therefore, the Court rejects Ms. Maniscalco's argument on this point.

### 1. ALJ's RFC Determination

An ALJ's findings of fact, including findings regarding the claimant's residual functional capacity, are conclusive when supported by substantial evidence. See 42 U.S.C. § 405(g). However, such findings are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. See Nguyen v. Chater, 172 F.3d 31, 31 (1st. Cir. 1999). When a claimant has called into question her functional ability to work, the ALJ must measure the claimant's capabilities, and "to make the measurement, an expert's RFC evaluation is ordinarily essential . . . ." Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 17 (1st Cir. 1996) (quoting Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991)). If a hearing officer determines the claimant's residual functional capacity "without any assessment of RFC by an expert," that determination will ordinarily be found to be unsupported by substantial evidence, and remand will be required. Beyene v. Astrue, 739 F. Supp. 2d 77, 83 (D. Mass. 2010); see Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.").

The courts have recognized only one narrow exception to this rule: namely, an ALJ is not precluded from rendering common sense judgments about functional capacity based on raw medical evidence, as long as the ALJ does not overstep the bounds of a lay person's competence. See Gordils, 921 F.2d at 329; Beyene, 739 F. Supp. 2d at 83. For example, "if the only medical findings in the record suggested that a claimant exhibited little in the way of physical impairments, but nowhere in the record did any physician state in functional terms that the

claimant had the exertional capacity to meet the requirements of sedentary work, the ALJ would be permitted to reach that functional conclusion himself." Gordils, 921 F.2d at 329.

Generally, however, when an ALJ assesses the effects of substantial mental impairments on a claimant's residual functional capacity without the aid of an expert's RFC assessment, the ALJ's finding is not supported by substantial evidence. See Rivera-Figueroa v. Sec'y of Health and Human Servs., 858 F.2d 48, 52 (1st Cir. 1988). In Rivera-Figueroa, the ALJ concluded that the claimant's mental conditions imposed no significant limitations on her ability to work, but the record contained no mental RFC assessment performed by a treating physician. Id. The First Circuit held that "[a]bsent a residual functional capacity assessment from an examining psychiatrist, we do not think the ALJ was equipped to conclude that claimant's condition was so trivial as to impose no significant limitation on ability to work." Id.

Similarly, when an ALJ rejects all of the expert RFC opinions in the record and instead relies on his own judgment in determining a claimant's RFC, the ALJ's decision is also unsupported by substantial evidence. See Rosado v. Sec'y of Health & Human Servs., 807 F.2d 292, 293 (1st Cir. 1986); Beyene, 739 F. Supp. 2d at 83. In Rosado, the record contained "only one instance in which an examining physician addressed the question of claimant's residual functional capacity in relevant, nonconclusory detail." 807 F.2d at 293. Although the physician opined that the claimant could not sit, stand, or walk for more than 1 hour at a time, and that he could not bend, or kneel, or lift more than 6 to 8 pounds, the ALJ disregarded this opinion and independently concluded that the claimant's exertional limitations would permit him to perform sedentary work. Id. The First Circuit vacated the ALJ's decision, holding that by "disregarding the only residual functional capacity evaluation in the record, the ALJ in effect has substituted his own judgment for uncontroverted medical opinion. This he may not do." Id. at 293-94.

Likewise, in <u>Beyene</u>, although the hearing officer considered two pieces of medical opinion evidence, he "made it clear . . . that he did not base his [RFC] decision on either of these two opinions." 739 F. Supp. 2d at 83. Instead, the hearing offer evaluated medical treatment notes, the claimant's GAF scores, and her testimony to reach his own conclusions about the claimant's RFC. <u>Id.</u> The court concluded that in such circumstances, the hearing officer's RFC finding "was made without relying on an assessment of RFC by an expert." <u>Id.</u> Furthermore, the court found that the claimant's RFC was not so obvious from the raw medical data that the ALJ could make such a finding without the aid of an expert. <u>Id.</u> at 84. Accordingly, the court remanded the case to the Commissioner "for development of evidence of [claimant's] mental and physical functional ability." <u>Id.</u>

This case is similar to both <u>Rosado</u> and <u>Beyene</u>, in that the ALJ appears to have rejected each and every opinion that exists in the record regarding the functional impact of Ms. Maniscalco's mental impairments, and instead, based his RFC findings on the medical treatment notes and Ms. Maniscalco's testimony. [AR 26-27]. Although the ALJ's decision indicates that he "considered" various pieces of medical opinion evidence, [AR 27], the ALJ expressly rejected each of them in turn. First, he gave "little weight" to the state agency medical consultants' RFC assessments [AR 546-559; 597-610], because those sources did not review the claimant's entire medical record. [AR 21]. The ALJ also stated that he gave "little weight" to the RFC opinion of Psychiatric Clinical Nurse Specialist Dublin [AR 27, 932-33], and "little weight" to the RFC opinion of Licensed Clinical Social Worker Maksymowicz [AR 27, 1047-48]. Both providers had treated Ms. Maniscalco, and both had concluded that she had marked limitations in her ability to maintain attention and concentration during a normal workday. The ALJ concluded,

however, that these opinions were not supported by the providers' treatment records or the longitudinal medical evidence as a whole. [AR 27].

In response to Ms. Maniscalco's argument that the ALJ impermissibly substituted his own medical judgment for those of the medical experts, the Commissioner relies on two additional pieces of evidence in the administrative record: a "report from a consultative psychologist, Dr. Doolin," [AR 541-45], and notes from a "psychiatric evaluation with Dr. Sidley, M.D," [AR 1117-1118]. According to the Commissioner, this evidence provides support for the ALJ's RFC findings. These two reports, however, contain no actual opinion evidence regarding Ms. Ms. Maniscalco's functional capacities; instead, they appear to be diagnostic notes accompanying psychiatric evaluations. Neither provider was asked to provide an RFC opinion, nor do their reports contain any helpful evaluation of how Ms. Maniscalco's mental limitations might affect her functional capacity to work. Therefore, these reports do not constitute medical opinion evidence sufficient to support the ALJ's RFC finding.

In sum, insofar as the ALJ rejected all of the medical opinion evidence of record, his findings with regard to Ms. Maniscalco's residual functional capacity appear to be premised on his own judgment and interpretation of the medical evidence. Furthermore, the evidence does not suggest that Ms. Maniscalco's mental impairments are so mild that they pose no significant functional restrictions, such that the ALJ would have been justified in determining Ms. Maniscalco's RFC without relying on an expert's RFC assessment. See Beyene, 739 F. Supp. 2d at 83. The ALJ himself concluded that Ms. Maniscalco's depressive and anxiety disorders were "severe." [AR 21]. Despite this, and based upon his determination of Ms. Maniscalco's credibility and his own independent interpretation of the medical records, the ALJ concluded that Ms. Maniscalco was able to maintain concentration, persistence, and pace for 2-hour periods;

that she could at least superficially interact with supervisors and coworkers; and that she could

deal with minor workplace changes. [AR 23]. This conclusion was not obvious from the raw

medical data, and required an interpretation from one with more skill than a layperson. See

Beyene, 739 F. Supp. 2d at 84; Rivera-Figueroa, 858 F.2d at 51-52 (holding that the hearing

officer was ill-equipped to conclude that the claimant's condition was so trivial as to impose no

significant limitation on ability to work without an RFC assessment from an examining

psychiatrist).

For these reasons, the ALJ's findings with respect to Ms. Maniscalco's mental RFC were

not supported by substantial evidence, and the Court remands this case to the Commissioner for

further consideration of Ms. Maniscalco's mental impairments and her residual functional

capacity in this regard. See Beyene, 739 F. Supp. 2d at 84.

### 2. The Vocational Expert's Testimony on Job Numbers

Ms. Maniscalco also challenges the ALJ's Step Five finding that there are "jobs that exist

in significant numbers in the national economy that the claimant can perform." [AR 28-29].

Specifically, Ms. Maniscalco argues that the vocational expert ("VE"), on whose testimony the

ALJ relied, used an unreliable methodology to estimate the number of jobs in the national

economy that Ms. Maniscalco could perform. At the hearing before the ALJ, the VE concluded

that a person with Ms. Ms. Maniscalco's limitations could do the work of a laundry worker

[DOT code 302.685-010], inspector and hand packer [DOT code 559.687-074], and fill and seal

machine operator [DOT code 559.685-018]. [AR 73-74, 77].[5] The VE further testified that with

respect to the "laundry worker" position, there were 3,500 such positions in Massachusetts, and

---

[5] Although the VE also testified that a person with Ms. Ms. Maniscalco's limitations might also
be able to perform the job of a library aide [AR 73], the ALJ did not rely on this testimony in
support of his Step Five findings. [AR 29].

272,000 such positions in the United States. [AR 73]. The VE testified that there were 1,600

"inspector and hand packer" positions in the Massachusetts economy, and 98,000 in the United

States. [AR 74]. Finally, with regard to the fill and seal machine operator position, the VE

testified that there were 1,690 such jobs in Massachusetts, and 99,903 such jobs in the United

States. [AR 77-78].

On cross-examination, counsel for Ms. Maniscalco explored how the VE arrived at those

figures. [AR 78-85]. The VE explained that the job numbers she provided were calculated using

software called "SkillTRAN," which she described as "a respected software and used throughout

the field." [AR 80]. Counsel asked the VE whether the specific job numbers she provided for the

three DOT codes corresponding to the laundry worker, fill and seal machine operator, and

inspector and hand packer were based on the individual DOT code, or whether they were

calculated based on the "overall OES codes" for a larger group of occupations. [AR 80-82].

Although the VE's testimony is not entirely clear, she explained that her understanding was that

SkillTRAN calculates job numbers for each individual DOT code (with each DOT code

corresponding to a specific occupation) by taking the total number of jobs in a larger

occupational category, and dividing that total number evenly by the number of individual DOT

codes within the category. [AR 83-84]. In this way, the software assumes that each DOT code

has an equal statistical frequency within its larger occupational group.

Ms. Maniscalco contends that the VE's reliance on the "SkillTRAN" software program is

unreliable. She argues that the software's methodology does not accurately reflect how many of

the jobs within the aggregate census code group are actually consistent with the ALJ's

hypothetical RFC question, because the many DOT specific occupations within a category may

vary by exertion and skill level. [AR 83].

Although Ms. Maniscalco made a similar argument before the ALJ, he dismissed her objections as "unsupported." [AR 29-30]. The Court disagrees and finds Ms. Maniscalco's objections to be well-founded, particularly where it is the Commissioner's burden to prove that the claimant is able to engage in substantial gainful activity that exists in "significant numbers" in the national economy. Sherwin v. Sec'y of Health and Human Servs., 685 F.2d 1, 2 (1st Cir. 1982). The VE's testimony at the hearing raises substantial questions about the accuracy and reliability of SkillTRAN's methodology. Although the record before the Court is not sufficiently developed for the Court to understand precisely how SkillTRAN calculates the job numbers upon which the VE relied in this case, the VE's testimony suggests that those numbers may have been based on what the Seventh Circuit has referred to as an

> unacceptably crude method of dividing the number of jobs in some large category . . . by the number of job classifications in the category, even though there is no basis for assuming that there are, for example, as many mophead trimmer-and-wrappers, DOT 789.687–106, as there are fish-egg packers, DOT 529.687–086, or poultry-dressing workers, DOT 525.687–082—all being hand-packager jobs.

Browning v. Colvin, 766 F.3d 702, 709 (7th Cir. 2014), reh'g denied (Oct. 28, 2014). While the Court cannot resolve this issue on the present record, the lack of clarity is grounds for remand, as the Court is unable to conclude that the Commissioner's step-five findings were supported by substantial evidence.

Furthermore, this does not appear to be a case where, notwithstanding a possibly flawed software methodology, the VE's own expertise provides independent support for the ALJ's finding that a substantial number of jobs exist. See Dorman v. Soc. Sec. Admin., No. 4:12-CV-40023, 2013 WL 4238315, at *8 (D. Mass. May 21, 2013). Here, when the vocational expert was asked how she determined the job numbers, she indicated that she "just go[es] by the information that is provided [by SkillTRAN]." [AR 83-84]. Thus, it would appear that the VE's testimony regarding job numbers was not based on – or even confirmed by – her own experience and

expertise. Although the Commissioner emphasizes the VE's testimony that SkillTRAN is a "respected software" and "used throughout the field," the reputation of the software alone is not sufficient without some additional corroboration or endorsement based on the VE's expertise and experience. In this case, the VE's own testimony suggests that she did not call upon any independent expertise when calculating the job numbers. Compare Dorman v. Soc. Sec. Admin., No. 12–40023–TSH, 2013 WL 4238315, at *7-8 (D. Mass. May 21, 2013) (vacating and remanding, where VE "admitted that his testimony was based solely on the raw numbers generated by the Job Browser Pro software and not on his own expertise") and Clark v. Astrue, Civil No. 09–390–P–H, 2010 WL 2924237 (D. Me. July 19, 2010) (holding that VE's testimony could not constitute substantial evidence that jobs existed in significant numbers, where the VE admitted that his numbers did not reflect individual DOT codes, but rather groups of jobs with different skill and exertional levels); with Poisson v. Astrue, No. 2:11-CV-245-NT, 2012 WL 1067661, at *9 (D. Me. Mar. 28, 2012) report and recommendation adopted sub nom. Poisson v. Soc. Sec. Admin. Com'r, No. 2:11-CV-00245-NT, 2012 WL 1416669 (D. Me. Apr. 24, 2012) (holding that VE's testimony was sufficiently reliable, where she "explained why she thought that the underlying data was reliable and endorsed the numbers derived therefrom as accurate.")

For the foregoing reasons, the ALJ's Step Five determination that jobs exist in significant numbers in the national economy that Ms. Ms. Maniscalco can perform is not supported by substantial evidence. Accordingly, this case will be remanded to the Commissioner for further development of the record in this regard.

**III. CONCLUSION**

For all the reasons detailed herein, this Court ALLOWS Ms. Maniscalco's Motion for an Order Reversing the Commissioner's Decision [Dkt. 16] and DENIES the Defendant's Motion for an Order Affirming the Commissioner's Decision [Dkt. 21]. The final decision of the

Commissioner is <u>VACATED</u>, and this case is hereby <u>REMANDED</u> to the Commissioner for further proceedings consistent with this Memorandum and Order.

       **SO ORDERED.**

Dated: March 3, 2016

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE
